IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSHUA JAKE ARCHULETA,<br><br>Archuleta. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:13-cr-132-cw<br><br>Judge Clark Waddoups |

## INTRODUCTION

Defendant Joshua Jake Archuleta filed his Motion to Suppress (Dkt. No. 16) on April 18, 2013. Archuleta moves to suppress all evidence obtained during his encounter with West Valley City Police on January 10, 2013, including all items seized from his possession and any statements he made to the police during his stop, questioning, detention and arrest. The court heard evidence on the Motion on May 16, 2013. Both parties filed briefs in support of their respective positions (Dkt. Nos. 31, 34, 45) and the court heard oral argument on September 3, 2013.

After careful consideration of the controlling legal principles, the testimony and exhibits from the evidentiary hearing, the arguments of the supporting and opposing memoranda and the oral arguments heard, the court now GRANTS Defendant's Motion to Suppress.

## FACTUAL BACKGROUND

Just after midnight on the morning of January 10, 2013 Archuleta was riding his bike near the intersection of 4700 South and 4800 West in West Valley City. (Tr. Ev. Hr'g, May 16, 2013, 5:24-7:1 [Dkt. No. 27].) Archuleta was wearing a red backpack and carrying a nondescript

black bag draped over one shoulder. (*Id*. at 12:7-19.) He was riding eastbound along 4700 South when he crossed over the street and entered the parking lot of a Maverick convenience store. (*Id*. at 8:1-3.) As he did so, a police car behind him activated its overhead lights. (*Id*. at 10:19-21.) In response to the overhead lights Archuleta stopped riding his bicycle (*id*. at 36:19-13), and the police car pulled up alongside him. (*Id*. at 10:23-11:6.)

The driver of the police car, Officer Panasai Soakai of the West Valley City Police Department, testified that he had been patrolling the area when he observed Archuleta riding an improperly lighted bicycle, and began to follow him. (*Id*. at 6:7-10, 7:1-20.) Officer Soakai testified that he witnessed Archuleta cross the street and enter the parking lot, an act he believed constituted jaywalking. (*Id*. at 35:6-10.) Officer Soakai testified that jaywalking and riding a bicycle at night without lights were both ticketable offenses (*id*. at 8:9-15), and it was for one or both of those violations that he activated his lights and stopped Archuleta in the parking lot. (*Id*. at 8:1-18.) As he stopped Archuleta, but before exiting his car, Officer Soakai called for a back-up officer. (Exh. 5 at page 4.)

After exiting his car, Officer Soakai approached Archuleta, who immediately asked why he had been stopped. (Tr. Ev. Hr'g, 10:19-22.) Officer Soakai responded that he was stopping him because his bicycle had no lights, and because he had jaywalked. (*Id*. at 11:24-12:3.) Then, with his first question to Archuleta, Officer Soakai asked what was in the black bag. (*Id*. at 39:12-15.) Archuleta responded that the bag contained a gun. (*Id*. at 13:9-12.) Officer Soakai then ordered Archuleta to raise his hands over his head, and he removed the black bag, placing it on the hood of his car. (*Id*. at 13:15-18.) Officer Soakai testified that once he took the bag away from Archuleta he did not intend to return it until he "decided it was okay for him to go." (*Id*. at 44:6-14.) After securing the black bag, Officer Soakai asked Archuleta if the gun inside belonged

to him. (*Id*. at 14:10-13.) Archuleta responded that it did, and that he had purchased it the previous day from another man in Kearns. (*Id*. at 14:16-17.) Officer Soakai then asked Archuleta for identification. (*Id*. at 15:8-11.) Having none, Archuleta instead gave Officer Soakai his name and date of birth. (*Id*. at 15:10-16.) It was about this time that Officer Dellinger, the back-up officer that Officer Soakai had requested, arrived. (*Id*. at 15:7-9.) Officer Dellinger pulled his patrol car up alongside Officer Soakai's and waited with Archuleta as Officer Soakai went back to his car to search his information in the police database. (*Id*. at 15:21-25.)

Officer Soakai testified that he searched Archuleta's identification, outstanding warrants, and criminal history in the police database. (*Id*. at 16:11-15.) His warrant search returned no outstanding warrants. (*Id*. at 16:16-18.) His criminal history search returned only one misdemeanor drug conviction (*Id*. at 16:21-23), although it did reveal other drug charges, and a domestic violence charge. (*Id*. at 16:20-23.)

Upon completion of the database searches Officer Soakai exited his car and asked Defedant "if he knew about his criminal history." (*Id*. at 17:7-10.) Specifically, he asked "if he knew of his drug history." (Exh. 5 at 4, ¶6; Tr. Ev. Hr'g. 17:9-20.) Archuleta responded that he was a drug user, and Officer Soakai then asked whether he had used drugs that day. (Tr. Ev. Hr'g. 18:12-18.) Archuleta responded that he had used drugs earlier that day. (*Id*. at 18:15-20.) Officer Soakai then asked whether Archuleta was currently in possession of any drugs, and Archuleta indicated that he "had meth on him." (*Id*. at 19:12-14.) At that point, Officier Soakai handcuffed Archuleta and began to search his person and belongings. (*Id*. at 21:24-22:4.) Finding no drugs on Archuleta's person, Officer Soakai then asked him where the drugs were, to which he replied they might be in his red backpack, and that the backpack also contained a drug scale. (*Id*. at 22:5-10.) A search of the red backpack revealed the drug scale, but no drugs. (*Id*. at 22:10-

15.) When questioned again, Archuleta stated that he may have left the drugs back in Kearns. (*Id.* at 22:16-19.)

After searching Archuleta's person and his red backpack, Officer Soakai then searched the black bag which he had previously taken from Archuleta. (*Id.* at 22:20-23:2.) Inside the black bag he found a disassembled firearm, including a gunstock and three gun barrels, and some syringes. (*Id.* at 23:3-6.) Archuleta said the syringes were not his, but might possibly belong to the individual from whom he purchased the gun. (*Id.* at 23:7-11.) After completing his search of the black bag, Officer Soakai took the handcuffed Archuleta back to his patrol car and read him the *Miranda* warnings. (*Id.* at 23:12-19.) Archuleta responded that he understood his rights, and agreed to speak with Officer Soakai. (*Id.* at 23:20-23.)

In his post-*Miranda* conversation with Archuleta, Officer Soakai pressed for more information about Archuleta's drug use, and the gun parts contained in the black bag. (*Id.* at 23:24-25:17.) Archuleta revealed that he smokes meth "once or twice a day," that he was separated from his wife, that he supports himself through odd jobs, and that he received the gun as payment for a non-drug-related debt. (*Id.*) Archuleta stated that he was on his way to drop the gun off at his mother's house when he was stopped by Officer Soakai. (*Id.* at 25:7-9.) Officer Soakai then advised Archuleta that he was going to be charged with possession of a firearm by a restricted person, possession of drug paraphernalia, and jaywalking. (*Id.* at 25:14-19.) He then transported Archuleta to the Salt Lake County Jail, where he was booked into jail on those three charges. Archuleta's property, including his bicycle, the red backpack and its contents, and the black bag and its contents, were booked into evidence. (*Id.* at 26:6-16, 29:17-30:4.) Officer Soakai testified that the whole encounter lasted approximately twenty-five minutes. (*Id.* at 26:8-10.)

<u>**ANALYSIS**</u>

**A.**     **Fifth Amendment**

**1.**     **Legal Standard**

The Fifth Amendment to the United States Constitution secures the individual right against compelled self-incrimination. U.S. Const. amend. V. The long and intricate history of our legal system underscores the need for vigilance in protecting and preserving this constitutionally enshrined privilege.[1] Consequently, in *Miranda v. Arizona*, the U.S. Supreme Court established procedural safeguards aimed at ensuring Fifth Amendment protections in the face of "overzealous police practices." 384 U.S. 436, 444 (1966).

Under *Miranda* "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. Specifically, "prior to *any questioning*, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444 (emphasis added). Absent any other "fully-effective" means of informing an individual of his rights and affording him the continuous opportunity to exercise them, these warnings must be administered. *Id.* at 444. Once

---

[1] An individual's right against self-incrimination has its roots in the maxim "*Nemo tenetur seipsum accusare*" (sometimes expressed as *Nemo tenetur seipsum prodere*) which, itself, "had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons," so common in the continental legal system. *Brown v. Walker*, 161 U.S. 591, 596 (1896). As noted in *Brown*, the gross exercise of deceptive and coercive prosecutorial practices so troubled the American colonists that the maxim, once merely a rule of evidence, "became clothed in this country with the impregnability of a constitutional enactment." *Id.* at 597. Of particular note and relevance here is the repugnance of asking seemingly innocent questions designed to elicit incriminating responses. *Id.* at 596 ("While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, *the ease with which the questions put to him may assume an inquisitorial character . . . made the system so odious as to give rise to a demand for its total abolition.*") (emphasis added). For fuller accounts of the development of this maxim into law, see John H. Wigmore, *Nemo Tenetur Seipsum Prodere*, 5 Harv. L. Rev. 71 (1891) and R. Carter Pittman, *The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America*, 21 Va. L. Rev. 763 (1935).

administered, a defendant may voluntarily, knowingly, and intelligently waive his rights. A voluntary waiver is "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and a knowing and intelligent waiver is one "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Without such a waiver, police may not continue to interrogate an individual in custody, and any confession or evidence obtained as a result of continued interrogation is inadmissible at trial. *Miranda*, 384 U.S. at 444-445.

*Miranda* does not mean that police officers must administer warnings to everyone they question, or before every conversation with a suspect. Rather, *Miranda* applies only to "custodial interrogation." *Id.* at 444. Therefore, "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (quoting *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008)). Thus, in order to determine whether a Fifth Amendment violation has occurred, the court must first consider two elements: (1) whether Archuleta was in custody, and (2) whether the actions of Officer Soakai constitute interrogation.

Whether an individual is in custody for *Miranda* purposes depends on the circumstances of his encounter with the police. Generally, there are three types of police-citizen encounters: (1) voluntary cooperation, (2) investigatory detentions (so-called "Terry stops") and (3) formal arrest. *Id.* at 1239. Only situations associated with formal arrest raise the question of custody, as it "is well established that a defendant is not in custody under either of the first two encounters." *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993) (citing *Berkemer v. McCarty*, 468 U.S. 420, 437-40 (1984)). The category of formal arrest, and hence the possibility of being in custody, is not limited to actual formal arrests, but includes police-citizen encounters where there

is "restraint on freedom of movement" or action "of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also Miranda*, 384 U.S. at 444 (custodial interrogations include interrogations where "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"); *Berkemer*, 468 U.S. at 440.

The determination of whether a suspect is in custody is an objective one, which requires a fact-intensive consideration of the totality of the circumstances. *Jones*, 523 F.3d at 1239-1240. The standard for making this determination is one of reasonableness—"whether a reasonable person in the suspect's position would have understood the situation as the *functional equivalent* of formal arrest." *Jones*, 523 F.3d at 1239 (citing *Chee*, 514 F.3d at 1112) (emphasis added). Hence, if, under the totality of the circumstances, a reasonable person would not feel free to end the police-citizen encounter and leave, the person is in custody. *Yarborough v. Alvarado*, 541 U.S. 652, 663-665 (2004). A reasonable person is one who "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *Id.* at 1239-40 (internal citation omitted).

Under this reasonableness standard, there are no "hard-line rules" which are dispositive of the question of custody. *Id.* at 1240. The courts have, however, identified a non-exhaustive list of factors to consider when determining whether an individual is in custody for *Miranda* purposes. *Id*. First, the court is to consider "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* (quoting *Griffin*, 7 F.3d at 1518). Next, the court is to look at the nature of the police questioning, including the length of questioning and nature of the questions asked, and their tendency "to create a coercive environment from which an individual would not feel free to leave." *Griffin*, 7

F.3d at 1518. Third, the court is to consider whether police dominate the encounter.[2] Beyond these three factors, the court is not only free to consider any other facts or conditions it finds persuasive as it considers the totality of the circumstances, but is bound to do so. *Jones*, 523 F. 3d at 1240 (noting that "although these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others"). If it is determined that an individual is in custody, the court then turns to a consideration of whether the police conduct constitutes interrogation.

Police questioning constitutes interrogation, for the purposes of *Miranda*, when police ask questions or engage in actions designed to elicit an incriminating response from a person, or when police should know their questions or actions are reasonably likely to elicit such a response. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Such questions and actions are the "functional equivalent" of expressly questioning a person about their criminal liability. *Id.* at 300-01. Thus, "a practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation." *Id.* at 301. An incriminating response is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. *Id.* at 302 n.5.

The determination of whether police should have known that a practice or question was likely to elicit an incriminating response is not subjective, but neither is it wholly objective. *Id.* at 301-02. The inquiry focuses more on the foreseeability of a suspect's response than on the intent of the police in asking or acting. *Id*. However, intent is not irrelevant. *Id.* at 302 n.7.

---

[2] The court has identified several "helpful guideposts" for determining whether police dominate any given police-citizen encounter. These include (1) separation of the suspect from family or colleagues who could offer moral support, (2) isolation in nonpublic questioning rooms, (3) the threatening presence of several officers, (4) display of a weapon by an officer, (5) physical contact with the subject, and (6) an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled. *Griffin*, 7 F.3d at 1518. These six guideposts are intended to aid the court in evaluating only one of three identified factors, from a non-exhaustive list of factors, which indicate whether, under the totality of the circumstances, an individual is "in custody" for the purposes of *Miranda* . Thus, each guide post alone carries very little weight.

This foreseeability-focus both serves the *Miranda* safeguards by vesting in susceptible suspects added protection from deceptive and coercive practices and simultaneously protects police against the unforeseeable results of their words or actions, by preserving the admissibility of spontaneous and unforeseeable responses as evidence at trial. *Id.* at 302.

Once both elements—custody and interrogation—are present the procedural safeguards of *Miranda* apply. Under these circumstances, the admissibility at trial of any statement is conditioned on warning a suspect of his or her rights. *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004). Thus, "failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility." *Id.*

Sometimes in the course of a custodial interrogation *Miranda* warnings are administered "midstream"—that is, police question a suspect, obtain an inadmissible confession, then *Mirandize* the suspect, obtain a waiver of the suspect's rights, and elicit a second confession. When this occurs, the court must undertake a careful examination of the facts of the interrogation to determine whether the midstream warning "function[ed] effectively as *Miranda* requires." *Id.* at 601. If it did, the post-warning confession may be admissible; if not, the post-warning confession is inadmissible. *Id.* This *post hoc* analysis of the circumstances of a police interrogation is appreciably difficult, especially given the inherently coercive nature of custodial interrogation. *Dickerson v. United States*, 530 U.S. 428, 444 (2000). The extent of that difficulty is underscored by the multiplex opinions in and surrounding *Seibert*, the most recent Supreme Court case to address midstream *Miranda* warnings.

In *Seibert* the defendant was arrested and interrogated for roughly half an hour without being advised of her rights under *Miranda*. During the course of that interrogation she confessed. The police then took a 20 minute break, after which they advised the defendant of her rights, obtained a signed waiver, and, after reminding the defendant of her previous confession, obtained a second post-waiver confession. *Seibert*, 542 U.S. 600. In a plurality opinion, with two concurring opinions, the Court found both the pre-and-post-warning statements inadmissible. The four justice plurality based its findings on the "threshold issue" of the effectiveness of the warning, asking

> [c]ould the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he would choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 611-12. In explaining its finding, the plurality identified five "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough" to remedy the failure to *Mirandize* at the outset of custodial interrogation, and to provide the suspect with a meaningful choice of action. *Id.* at 615. Those five relevant facts are

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id*. Using these five facts as a guide, the Court found that the tactics employed by the police in *Seibert* "by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings." *Id.* at 616.

*Miranda* warnings are intended to reduce the risk that a defendant will give a coerced or involuntary confession. *Id.* at 617. By employing a two-step "question first," *Mirandize* second strategy, the police in *Seibert* "render[ed] *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. None of the facts surrounding the post-warning confession were sufficient to persuade the plurality otherwise, and the Court's reasoning suggests that making a midstream warning effective is a difficult task. As the plurality noted, "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613. Moreover, the suspect is likely to be perplexed by midstream warnings, and confused about whether previous statements could be used against him. *Id.* Thus, when *Miranda* warnings are given in the midst of continuous custodial interrogation, they are likely to be misleading and ineffective. *Id.* at 613-14. There is, of course, always the possibility an officer might make a "good faith mistake," but *Seibert* was not such a case. *Id.* at 615-616.

Justice Breyer "join[ed] the plurality's opinion in full," with a concurrence that espoused a "simple" exclusionary rule akin to the "fruit of the poisonous tree" doctrine, with an exception made for good faith mistakes. *Id.* at 617 (concurrence included a specific citation to *Wong Sun v. United States*, 371 U.S. 471 (1963), where, in a Fourth Amendment context, the Court excluded any evidence obtained as a "fruit" of an illegal search and seizure).

Justice Kennedy also concurred in the judgment, agreeing with the plurality's conclusion, but positing an approach which would allow admission of statements obtained in violation of the *Miranda* safeguards "when the central concerns of *Miranda* are not likely to be implicated and

when other objectives of the criminal justice system are best served by its introduction." *Id.* at 618-19. Under this approach, unless police engage in a deliberate two-step strategy, the admissibility of post-warning statements would be governed by the principles set forth in *Oregon v. Elstad*, which holds that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of coercion." 470 U.S. 298, 314 (1985). Rather, in Justice Kennedy's view, "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights," thereby rendering some post-warning confessions admissible which would otherwise be inadmissible under the plurality's standard. *Id.* at 314. When police use a deliberate two-step process, Justice Kennedy would find that "post-warning statements that are related to the substance of pre-warning statements must be excluded unless curative measures are taken before the post-warning statement is made." *Seibert*, 542 U.S. at 622. Such curative measures might include a change of location or circumstances, or a prolonged break between interrogations. *Id.*

In interpreting *Seibert*, this court agrees with the observation that "determining the holding of *Seibert* is not easy in light of the fragmented nature of the opinion." *United States v. Sanchez-Gallegos*, 412 Fed. Appx. 58, 72 (10th Cir. 2011) (Ebel, J., concurring). Previously, in *United States v. Tolutau*, this court referenced Justice Kennedy's standard, writing that "*Seibert* only directs courts to hold [custodial] confessions inadmissible if they were obtained as a result of a deliberate strategy to elicit an inadmissible confession for the purpose of coercing a second confession after the extension of *Miranda* warnings." No. 12-cr-00022-CW, 2012 WL 1898879,

at *5, (D. Utah May, 23, 2012). In so stating, the court relied uncritically on the concurrence in *United States v. Sanchez-Gallegos*, 412 Fed.Appx. 58, 72-74 (10th Cir. 2001).

In *Sanchez-Gallegos*, a three judge panel held that un-*Mirandized* statements made by the defendant were not inadmissible. Each member of the panel wrote his or her own concurring opinion. Two of the three judges concluded that the defendant was not in custody, and therefore the statements were admissible. *Id*. In reaching that conclusion, both of those judges relied on separate tests. Judge Holmes found that the defendant's "freedom was not curtailed to the degree associated with formal arrest," and therefore *Miranda* warnings were not required. *Id.* at 67. Judge Briscoe relied on the totality of the circumstances to determine that the defendant was not in custody. *Id.* at 67-69.  By contrast, Judge Ebel concluded that the defendant *was* in custody, but that in light of Justice Kennedy's *Seibert* opinion, the defendant's statements were admissible. *Id.* at 72-73. In relying on Justice Kennedy's concurring opinion, Judge Ebel explicitly noted that the Circuit Court "declined to determine whether the four justice plurality or Justice Kennedy's concurrence reflects the holding of *Seibert*." *Id.* at 72.[3] He then noted his

---

[3] Normally, when faced with a "fragmented" court, the so-called "*Marks* rule" is applied. *Marks v. United States*, 430 U.S. 188, 193 (1977) (where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"). In the present case, the "narrowest grounds" might seem to be Justice Kennedy's concurrence. However, in *United States v. Carrizales-Toledo*, the Tenth Circuit questioned the applicability of the *Marks* rule to *Seibert*. 454 F.3d 1142, 1151-52 (10th Cir. 2006). The court explained that, in practice "the *Marks* rule produces a determinate holding 'only when one opinion is a logical subset of other, broader opinions.' When the plurality and concurring opinions take distinct approaches, and there is no 'narrowest opinion' representing the 'common denominator of the Court's reasoning,' then *Marks* becomes 'problematic.'" *Id.* at 1151 (internal citations omitted).

Applying *Marks* to *Seibert* was especially problematic to the Court "because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court." *Id.* (noting that both the dissent and the plurality rejected the reasoning of the concurrence, at least in part). The Court stopped short of determining which opinion accurately reflects the holding of *Seibert* because the facts of the case did not require it to do so, *id.* (determination not necessary because the suspect's statements would be admissible under both tests), but it expressed clear reservations about applying Justice Kennedy's concurrence, and the Tenth Circuit has not yet been afforded the opportunity to revisit the issue directly. The only subsequent comment on the question comes from a concurring opinion in a later case. *Sanchez-Gallegos*, 412 Fed. Appx. at 72-73 (expressing the opinion that Justice Kennedy's opinion controls) (Ebel, J, concurring).

Other circuits are split on which opinion represents the holding of *Seibert*. Both the First and Sixth Circuits have acknowledged concerns about adopting Justice Kennedy's approach, without deciding the question. See *United*

personal concurring opinion, but not the opinion of the Court: "However, I would hold that Justice Kennedy's concurrence, as the narrowest grounds for the Supreme Court's decision to suppress, represents the holding of *Seibert*." *Id*. It is this statement which the court directly cited in *Tolutau* to support the proposition that "[b]ecause Justice Kennedy's more narrow concurring opinion was necessary for the judgment, it is the controlling precedent with respect to the treatment of post-*Miranda* confessions preceded by pre-*Miranda* interrogation and confession." *Tolutau*, 1898879 WL at *5. But fuller consideration reveals that *Sanchez-Gallegos* does not, in fact, rest on the application of Justice Kennedy's concurrence. Even absent Judge Ebel's concurrence, the defendant's statements in that case would not have been suppressed because the other two judges were in agreement that he was not in custody when he made them. That case would be resolved based solely on the question of custody, irrespective of what Judge Ebel concluded.[4] Judge Ebel's concurrence was not "necessary to the judgment" in *Sanchez-Gallegos*, and, therefore, his opinion that Justice Kennedy's concurrence is "necessary to the judgment" in *Seibert* does not control.[5] Thus, even if *Tolutau* relies on *Sanchez-Gallegos* to support the contention that Justice Kennedy's concurrence is the only proper reflection of *Seibert's* holding,

---

States v. Widi*, 684 F.3d 216, 221 (1st Cir. 2012); *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 FN 11 (6th Cir. 2008). The Seventh Circuit has held that the plurality opinion controls. *United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009). The Second, Third, Fourth, Fifth, Eighth, Ninth and Eleventh Circuits have all held that Justice Kennedy's opinion controls. See *United States v. Capers*, 627 F.3d 470 (2d Cir. 2010); *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006); *United States v. Mashburn*, 406 F.3d 303 (4th Cir. 2005); *United States v. Courtney*, 463 F.3d 333 (5th Cir. 2006); *United States v. Torres-Lona*, 491 F.3d 750 (8th Cir. 2007). *United States v. Williams*, 435 F.3d 1148, 1157-58 (9th Cir. 2006); *United States v. Street*, 472 F.3d 1298 (11th Cir. 2006).

[4] Consider, for example, if Judge Ebel had applied Justice Kennedy's standard and found that the statements of the defendant should be suppressed. It would not have changed the outcome in the case, and therefore, upon further reflection, to say it is in any way the "controlling" standard in *Sanchez-Gallegos* does not follow. *Marks* requires the application of the most narrow grounds upon which the opinion of the court may rest, but, as demonstrated here, the opinion of the Court does not rest upon Judge Ebel's concurrence, and therefore applying *Marks* does not apply.

[5] Thus, the best guidance this court has on the matter is the Tenth Circuit's skepticism regarding the applicability of Justice Kennedy's concurrence, as expressed in *Carrizales-Toledo*. See note 3, *supra*.

this court remains free to apply the fuller standard of the plurality.[6] Moreover, the statement at issue in *Tolutau* would properly have been suppressed under the standard articulated by the *Seibert* plurality.

## 2. Application

To apply these principles to Archuleta's case, the court must first determine whether, and when, Archuleta was in custody. The overall standard is one of reasonableness, and the question the court must ask is whether, under the totality of the circumstances, a reasonable person in Archuleta's position would have felt free to end the encounter with Officer Soakai and leave. The factors set forth in *Jones* are relevant to this analysis.

The first *Jones* factor is the extent to which Archuleta was made aware that he was free to refrain from answering questions, or to end the interview at will. Archuleta concedes that Officer Soakai had reasonable suspicion to conduct his initial stop for improper bike lighting. (Dkt. No. 31 at 15.) However, it was not until *after* Officer Soakai had stopped Archuleta, confiscated his gun, run his identity and criminal history check, questioned him, searched his person and his belongings, handcuffed him, questioned him further, and then taken him to the squad car that Officer Soakai ever intimated in the least that Archuleta had the right to refrain from answering questions or to terminate the encounter. Prior to that, Officer Soakai did nothing to make Archuleta aware of his rights. The prosecution admits as much. (Dkt. No. 34 at 17.)

The second *Jones* factor is the nature of the police questioning, including the length of the questioning and the nature of the questions asked, and their tendency to create a coercive

---

[6] If the court were to apply Justice Kennedy's standard, Archuleta's statements would likely still be inadmissible. While Officer Soakai was not under strict instruction to employ a "two-step" process, his refusal to issue a ticket and return Archuleta's property when he had no objective reason to suspect that Archuleta's possession of the gun was unlawful, and instead launch an unfounded, un-*Mirandized* interrogation in the hopes of eliciting incriminating statements is analogous to the intent and acts of the police in *Seibert*. His actions were, in every meaningful sense, "deliberately coercive" and "improper" under *Elstad*, which Justice Kennedy invokes as the foundation for his concurrence.

environment from which Archuleta would not feel free to leave. The entire encounter between Archuleta and Officer Soakai lasted roughly twenty-five minutes. Although the questioning was not particularly prolonged, the nature of the questions asked, coupled with the actions of Officer Soakai, created an extremely coercive environment from which a reasonable person would most likely not feel free to leave.

Officer Soakai's first question to Archuleta was "what's in the bag?" It had nothing to do with the purpose of the stop, and while it may have been borne of legitimate safety concerns, once Officer Soakai had secured the bag those concerns should have been assuaged. Yet he continued to inquire about the gun, asking whether the gun belonged to Archuleta. At that point Officer Soakai had no basis to suspect that Archuleta's possession of a gun was unlawful. He then asked Archuleta for his name and ran criminal history check. Far from heightening Officer Soakai's suspicions about the gun, Archuleta's criminal history should have put to rest any lingering questions. Archuleta had only one misdemeanor conviction, and could not, therefore, be a felon in possession of a gun. Based on the facts in evidence to that point, Officer Soakai should have issued any applicable citation for the traffic violations, returned the gun, and released him. Not only did he not do so, but he continued to probe, giving no indication whatsoever that Archuleta was free to go or to decline answering questions.

Officer Soakai asked defendant about his criminal history and drug use. He asked him whether he had used drugs that day. He asked whether he was in possession of drugs, and when Archuleta responded affirmatively, he handcuffed him and searched him. He found no drugs, but still he persisted in his questioning. He then searched Archuleta's backpack and bag. After all of this Officer Soakai finally read him his rights. The court finds this line of questioning and course of action coercive. The confiscation of his gun was a clear signal that he was not free to leave, a

fact backed up Officer Soakai's own testimony that he did not intend to give the gun back to Archuleta until he had decided it was okay for him to go. Each successive question about drug use piled more pressure on Archuleta to answer. The handcuffing and search of his person made leaving a logical implausibility, if not a physical impossibility. If Officer Soakai's actions were not coercive, it raises questions of when would a reasonable person in Archuleta's position have felt free to stop answering questions and leave. When Officer Soakai confiscated his gun? When he began an unfounded line of inquiry into his drug use? When he was handcuffed and searched? When his backpack and bag were being searched? The obvious answer is none of those times. Officer Soakai's questions and actions created a coercive environment from which a reasonable person would not feel free to leave.

The final *Jones* factor is whether police dominated the encounter. To determine this the court must consider the six guideposts identified in *Jones*. First, at no point was Archuleta separated from family or colleagues who could offer moral support, because he was alone to begin with. Second, Archuleta was not isolated in a nonpublic questioning room—he was questioned in public in the Maverick parking lot. Third, there were two officers present for the majority of the encounter, although there is no evidence their presence was threatening. Fourth, it is uncontested that neither officer brandished a weapon at any point during the encounter. Fifth, at most there was only incidental physical contact between Officer Soakai and Archuleta when Officer Soakai removed the bag from him. There was additional physical contact when Officer Soakai handcuffed and searched Archuleta. Sixth, Officer Soakai's tone may have been conversational, but his questions and actions seemed to imply that compliance was compuslory. He ordered Archuleta to raise his hands, and he confiscated his gun. He handcuffed Archuleta and searched him while questioning him about his drug use. As soon as Archuleta said he had

drugs on him, Officer Soakai handcuffed Archuleta and searched him. As soon as he said the

drugs might be in the backpack, he searched the backpack; likewise, the black bag. Officer

Soakai followed up each response with immediate action, leaving little to no time for objection

or refusal to obey. Given this analysis of the six guideposts, the third *Jones* factor seems mixed.

At most, it may slightly weigh in favor of a finding that police did not dominate the encounter.

In light of the facts set forth above, the court finds that a reasonable person in Archuleta's

position would not have felt free to refrain from answering Officer Soakai's questions and leave

the parking lot. Although the third *Jones* factor is mixed, the first two weigh heavily in favor of

finding that Archuleta was in custody. Officer Soakai did nothing to make Archuleta aware of his

rights. He confiscated Archuleta's gun and retained it in spite of the fact that all the evidence up

to and including the criminal history check suggested that it was lawfully possessed. Following

the criminal history check he engaged in a highly coercive line of questioning, and a series of

highly coercive searches of Archuleta and his property, all without ever once indicating in any

way that Archuleta had the right to refuse to answer and end the encounter. Under the totality of

these circumstances, a reasonable person in Archuleta's position would likely understand the

situation as the functional equivalent of formal arrest. Therefore, the court finds that Archuleta

was in custody at *least* from the moment that Officer Soakai returned from running the

background check and, instead of issuing a citation and returning the gun, began to question

Archuleta about his drug use.

Because Archuleta was in custody, the court next looks to whether Officer Soakai's

words and actions during the custodial encounter constitute interrogation. In making this

determination the court applies the *Innis* standard to ask whether Officer Soakai asked questions

or engaged in actions designed to elicit an incriminating response from Archuleta, or whether he

should have known that his questions and actions were reasonably likely to elicit such a response. Based on the facts, the court finds it likely that Officer Soakai did know, and if not, that he should have known his questions and actions were reasonably likely to elicit incriminating statements.

All of Officer Soakai's questions to Archuleta were unrelated to the initial purpose for the stop. All of his questions to Archuleta before running his criminal history were about the black bag and its contents, and nearly all of his questions after running the criminal history were about drug use or the gun. Not once did he ask about the bike lights, or jaywalking. However, because it is arguable that Officer Soakai was genuinely concerned about safety when he made his initial inquiry about the black bag, and because the court determines that Archuleta was in custody at *least* from the moment Officer Soakai returned from the criminal history check and began to question him, the focus is on the questions and actions of Officer Soakai after that point.

The first question Officer Soakai put to Archuleta after returning from his squad car was whether Archuleta was aware of his criminal history—specifically whether he was aware of his drug use. It is difficult to conceive of any purpose for this question other than to elicit an admission of drug use, and the prosecution offers no other explanation for it in its brief.[7] The question had nothing to do with the traffic violation. It had nothing to do with safety. Moreover, asking the question implies the answer, for what individual would not be aware of his own criminal history? By its very nature, this question was designed to do nothing but elicit an answer which would reveal the defendant's drug use, and Archuleta in fact confessed to using

---

[7] Indeed, the prosecution acknowledges in its brief that criminal history alone is insufficient for reasonable suspicion (Dkt. No. 34 at 10) and, as discussed previously, Officer Soakai had no other indication that Archuleta was engaging in any sort of criminal activity. The logical conclusion, then, is that Officer Soakai was trying to elicit a statement which would give him reasonable suspicion. This element of intent weighs in favor of finding that the questioning constitutes an interrogation.

drugs. The prosecution now seeks to admit that answer as evidence at trial. This exchange alone bears all the hallmarks of interrogation.

If Officer Soakai did not know that Archuleta's response to this question was likely to be incriminating, he should have. Foreseeability is the predominating factor in determining whether police should know their questioning is likely to elicit an incriminating response. Not only is the answer that one uses drugs a foreseeable response to the Officer Soakai's question, it is, as noted above, the only logical response. Beyond mere foreseeability, Officer Soakai testified that his intent in asking the question was to ascertain whether Archuleta "knew if he was able to own [the] firearm." (Dkt. No. 27, 55:4-19). When pressed further, Officer Soakai admitted that the question was a foundational question to necessary to determine whether Archuleta was currently using drugs, which would make his possession of the gun illegal. *Id*. Officer Soakai agreed that, if Archuleta admitted to using drugs that day, such a statement would be "incriminating." (*Id*. at 52:3-8).

After Archuleta admitted his drug use, Officer Soakai continued to ask calculated questions designed to elicit additional incriminating statements, and to procure evidence which could be used to bring charges against Archuleta. Officer Soakai inquired specifically about when he had last used drugs, and whether he was currently in possession of any drugs. Given that Archuleta had already admitted to using drugs, it was foreseeable that any answer he gave would only serve to further incriminate him. Likewise, when Officer Soakai's search of Archuleta did not turn up any incriminating evidence, he continued to press Archuleta for answers that would help him locate the drugs. Any response to those questions would only add to the tally of incriminating statements, and any evidence obtained through the searches which attended Archuleta's responses were likely to be used against him in court. Because Officer

Soakai's questions and actions were calculated to elicit an incriminating response from Archuleta, and because Officer Soakai both knew, and should have known that it was reasonably likely Archuleta's responses would be incriminating, the court finds that Officer Soakai's questioning constitutes interrogation under *Innis*.[8]

Because Archuleta was both in custody and under interrogation, he should have been given a *Miranda* warning and afforded a meaningful opportunity to exercise his rights. Because no warning was administered at the outset of the custodial interrogation, all of the statements he made while in custody, and prior to being *Mirandized* are inadmissible. The only remaining question for the court to decide is whether the *Miranda* warning Archuleta received, as delivered midstream, functioned effectively to afford Archuleta the full *Miranda* protections, despite the residual taint of coercion from the first stage of the interrogation. The court finds that it did not.

Under the plurality opinion in *Seibert*, when a *Miranda* warning is delivered midstream in a custodial interrogation, five relevant facts bear on whether the warning was effective. The court considers each of these facts in turn.

First, the questions which Officer Soakai asked before giving the *Miranda* warning were complete and relatively detailed. The prosecution asserts that the questions were neither complete nor detailed because "Officer Soakai asked the defendant a limited amount of questions for one or two minutes in the Maverick parking lot." (Dkt. No. 34 at 23.) The prosecution mistakenly treats completeness and detail as synonymous with duration and number of questions asked. Before giving the warning Officer Soakai asked whether Archuleta owned the gun,

---

[8] The prosecution asserts that Officer Soakai had reasonable suspicion throughout the stop which justified his continued investigation under the Fourth Amendment. Regardless of whether the court agrees with this assertion, it misses the mark. When a suspect is subjected to custodial interrogation, it does not matter, for the purposes of *Miranda*, whether there is reasonable suspicion to continue the investigation. What matters is that the suspect is advised of his rights and afforded a meaningful opportunity to exercise them. Because Archuleta was in custody and being interrogated, he should have been given a *Miranda* warning.

whether he had used drugs, when he had last used drugs, whether he had any drugs on him, where the drugs were, and several other specific questions about the location of the drugs. With the answers to these questions, Officer Soakai had all the evidence he needed to arrest and charge defendant with being a restricted person in possession of a firearm, possession of paraphernalia, and jaywalking—the three offenses for which Archuleta was ultimately booked into jail. The post-warning interrogation fleshed out a few details, but added nothing of substance to the evidence against Archuleta. The only additional details Officer Soakai testified to learning after the warning was that Archuleta uses drugs once or twice a day, that he was separated from his wife, that he supports himself through odd jobs, that Archuleta received the gun as payment for a debt, and that he was on his way to drop the gun off at his mother's house. While some of these facts add detail, they add no substance to what Archuleta had already confessed.

Second, there is no evidence that the statements which Archuleta made in the pre-and-post-warning interrogations overlap significantly, but the details provided in the post-warning interrogation would have been meaningless without the prior statements. The prior statements served as predicates for the follow-up questions. There would have been no reason to ask the questions except for the incriminating answers. Moreover, each answer providing additional detail, however insignificant, effectively amounts to a confirmation of the earlier, inadmissible confession. Therefore, while the content of the statements does not overlap significantly, there is a strong connection between the two.

Third, both interrogations took place in the Maverick parking lot, in immediate succession. The prosecution distinguishes Archuleta's situation on this fact from the suspect in *Seibert* by pointing out that Archuleta was not dragged out of bed and taken to the police station at 3 a.m. This is true, but that is only one part of the notion of location. *Seibert* makes it clear that

one of the reasons location is considered is because a change in location between the pre-and-post-warning interrogations can have a curative effect on the coercive damage from a prior confession. There was no change in location here, nor was there a break between interrogations, which might also have served a remedial function. Rather, Archuleta was in one location and subjected to a continuous series of questions. In this situation the midstream warning did little, if anything, to suggest that anything had changed, and that Archuleta was actually free to refrain from saying anything about using drugs, or more still, to leave.

Fourth, both the pre-and-post-warning interrogations were conducted by Officer Soakai, alone. Again, the prosecution attempts to factually distinguish *Seibert*, and in so doing, misconstrues it. As with breaks in time and changes in location, the introduction of a second officer tends to make midstream warnings more, not less, effective. When a new officer comes into an interrogation and reads a suspect his or her *Miranda* rights, the suspect is faced with a fresh decision of whether to tell the new officer anything. This is exactly the protection *Miranda* intended to provide. However, when one officer conducts the entire interrogation, the choice not to speak becomes less meaningful, because the suspect is acutely aware of what the interrogating officer already knows. Such is the case here. Because Officer Soakai conducted the entire investigation, it is less likely that Archuleta ever had a meaningful opportunity to exercise his rights.

Fifth, although there is no evidence that Officer Soakai ever referred explicitly to Archuleta's pre-warning admissions, all of his post-warning questions relied directly on those earlier statements. Questions about the gun, the frequency of drug use, and the location of the drugs all rely, at least implicitly, on Archuleta's admissions that he owned the gun, was a drug user, had used drugs that day, and had drugs on him (although this last admission proved false).

Reliance on these recent statements suggests that Officer Soakai was not beginning a new interrogation, post-warning, but was, instead, simply conducting one continuous interrogation. Officer Soakai's testimony suggests the same. (*Id.* at 52:14-53:7.)

In light of these five facts, the court believes that the warning which Archuleta received could not "effectively advise him that he had a real choice" about whether to speak to Officer Soakai, nor could it "reasonably convey" that he could stop talking, even though he had talked earlier. *See Seibert*, 542 U.S. at 611-12. Having been given an ineffective warning, it was impossible for Archuleta to voluntarily, knowingly, and intelligently waive his rights.

In sum, because Archuleta, who was in custody and had just been interrogated, was not in a position to make an informed choice, "there is no practical justification for . . . treating the second stage of [his] interrogation as distinct from the first, unwarned and inadmissible segment." *Id.* Accordingly, the court excludes Archuleta's statements from both the pre-and-post-warning interrogation.

## B.      Fourth Amendment

Having found Archuleta's statements to be inadmissible, the court turns next to the admissibility of the physical evidence obtained as a direct result of those statements.

### 1.      Legal Standard

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Routine traffic stops are generally more analogous to an investigative detention than a custodial arrest, and such stops are analyzed by asking first

"whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

"[A]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A detention which is reasonable in scope "usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" *Hunnicutt*, 135 F.3d at 1349 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Lengthening detention for further questioning beyond the immediate reason for the initial stop is permissible in two circumstances. First, unrelated questioning is permissible if the detention has become a consensual encounter. *United States v. Gonzalez-Lerma*, 14 F.3d 1479 (10th Cir. 1994) (overruled on other grounds). Alternatively, the officer may detain [an individual] for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *Id*. at 1349 (citing *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993)). Once the detention becomes a custodial arrest, however, it must be supported by probable cause. *Beck v. Ohio*, 379 U.S. 89, 91. Probable cause may not be based on an involuntary statement given in violation of *Miranda*. *United States v. Garcia*, No. 2:05-cr-391-TC, 2005 U.S. Dist. LEXIS 38347 (D. Utah Dec. 28, 2005). Seizures unsupported by reasonable suspicion or probable cause are illegal seizures, and evidence obtained as a direct result of those seizures is inadmissible. *Wong Sun v. United States*, 371 U.S. 471 (1963); *see also Villa-Gonzalez*, 623 F.3d at 534-35; *Garcia*, 2005 U.S. Dist. LEXIS 38347 at *24.

Although statements obtained in violation of *Miranda* are inadmissible, "the *Miranda* presumption does not require that the 'fruits of unlawfully obtained confessions be discarded as inherently tainted.'" *United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) (quoting *Elstad*, 470 U.S. at 307); *see also United States v. Patane*, 542 U.S. 630 (2004). Rather, in *Patane*, a fractured Court suggested that, when a statement is unlawfully obtained, the admissibility of the physical fruits of that statement turns on the question of coercion. *Patane*, 542 U.S. at 639-640 (noting that *Miranda* creates a presumption of coercion which "necessarily sweep[s] beyond the actual protections of the Self-Incrimination Clause" and therefore absent actual coercion, exclusion of non-testimonial evidence obtained from a mere failure to warn is not required).

Neverthelss, *Patane* is not universally applicable, and when applying *Patane* is inapposite, the courts have looked to a standard of actual voluntariness in the Fourth Amendment analysis to determine whether physical fruits of unlawfully obtained statements should be suppressed. *Pettigrew*, 468 F.3d at 635-637 (where the Court looked beyond the "fruits doctrine" to the voluntariness of the defendant's statements to determine whether to suppress physical evidence gathered from a search based on unwarned admissions); *see also United States v. Villa-Gonzales*, 623 F.3d 526 (8th Cir. 2010) (finding *Patane* inapplicable and suppressing fruits of an unwarned statement on Fourth Amendment grounds). In exploring voluntariness in *Pettigrew*, the Tenth Circuit examined "whether the confession is the product of an essentially free and unconstrained choice by its maker" or whether "his will has been overborne and his capacity for self-determination critically impaired" *Pettigrew*, 468 F.3d at 637.

## 2. Application

The court finds *Patane* inapplicable here. In *Patane*, the defendant interrupted police who were trying to advise him of his *Miranda* rights, and volunteered the location of the physical evidence at issue. Archuleta's comments were not only not this sort of unsolicited, spontaneous response, but were, as explained above, the only reasonable responses to calculated, coercive questioning which had the sole purpose of eliciting an incriminating response. Consequently, *Pettigrew* and the Fourth Amendment standards are more readily applicable.

It is evident under the logic of *Pettigrew* that Archuleta's statements were not, in any meaningful way, voluntary. In *Pettigrew*, the court found that statements made in custody, half an hour apart, to different officers, without any attempt by police to obtain incriminating evidence, and without relying on any previous, unwarned statements for their foundation, were made voluntarily. Archuleta, on the other hand, made all of his statements in relative succession, to one officer who was explicitly trying to incriminate him, and each statement he made served as the predicate for successive questioning and searches. This, coupled with the court's earlier analysis of the encounter between Archuleta and Officer Soakai, reveals that Archuleta's statements were not the product of free and unconstrained choice, but rather, each answer painted Archuleta further and further into a corner from which there was no reasonable escape. The court, therefore, finds that Archuleta's statements were not voluntary.

Lastly, because the statements were not voluntary, the seizure of the physical evidence violates the Fourth Amendment. Archuleta concedes that Officer Soakai had probable cause to stop him for a minor traffic violation. However, the encounter was not a consensual one, and Officer Soakai's actions exceeded the permissible scope of the stop by questioning beyond the immediate reason for the stop without reasonable suspicion. As set forth above, Officer Soakai

lacked any reasonable suspicion to continue detaining Archuleta after reviewing his criminal history and confirming that he was not a felon in possession of a firearm. Furthermore, as in *Garcia*, Officer Soakai relied solely on involuntary, unwarned statements to provide him with probable cause to search Archuleta and his bag. And, as in *Garcia*, because he improperly relied on these inadmissible statements, those searches were illegal, and the physical evidence seized as fruits of those searches should be suppressed.

## <u>CONCLUSION</u>

For the reasons stated above, Archuleta's Motion to Suppress (Dkt. No. 16.) is GRANTED.

SO ORDERED this 3rd day of October, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge